**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:15-cr-20025-JPM |
| v. | ) | 2:16-cr-20029-JPM |
| | ) | |
| PRESTON BYRD, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING DEFENDANT'S RENEWED MOTION FOR RECUSAL

Before the Court is the Defendant's Renewed Motion for Recusal, filed on August 17, 2021.  (ECF No. 234.)[1]  Defendant moves the Court pursuant to 28 U.S.C. §§ 144 & 455 for the Court to recuse itself from presiding over this matter.  (Id. at PageID 2602.)  The United States filed a Response in Opposition to Defendant's Sealed Renewed Motion for Recusal on August 20, 2021.  (ECF No. 235.)  Defendant filed a Reply to Government's Response on August 27, 2021.  (ECF No. 237.)

For the reasons set forth below, Defendant's Renewed Motion for Recusal is **DENIED**.

## I.      BACKGROUND

### A.   Defendant's History Before the Court

Preston Byrd ("Byrd") first appeared before the Court on September 4, 2015, in case number 2:15-cr-20025 (see ECF No. 44), having been indicted on three counts of wire fraud and three counts of engaging in monetary transactions in criminally derived property (see ECF

---

[1] Parallel filings to those referenced in this Order were also filed in Docket No. 2:16-cr-20029-001.  Unless otherwise noted, ECF citations will be to the filings in Docket No. 2:15-cr-20025-001.

No. 41).[2]  On March 23, 2016, a jury found Defendant guilty on all six counts.  (ECF No. 121.)  As noted in the Presentence Investigation Report, on April 27, 2016, Defendant's "bond was revoked . . . as a result of him contacting a witness in this case prior to trial, as well as withholding information regarding his civil judgment debt on a franchise application to purchase a Pak Mail store in Collierville, Tennessee."  (ECF No. 153 at PageID 489.)  In the Offense Level Computation section of the Report, two levels were added for Defendant's willful Obstruction of Justice in the case.  (Id. at PageID 495.)  The revised Sentencing Recommendation, which recommended a sentence of 37 months in custody, justified its recommendation of the upper limit of the 30–37-month guideline provision as follows: "This is defendant's second federal case for similar conduct and it is apparent that the defendant has no regard for the law, as he has shown no remorse for his conduct . . . ."  (ECF No. 153-2 at PageID 509–10.)  On June 16, 2016, in the context of the Government's request for an upward variance for a total of 46 months in custody (ECF No. 156 at PageID 541), the Court sentenced Defendant to 42 months' imprisonment (as well as three years of Supervised Release).  (ECF No. 163 at PageID 720–21.)

Less than two weeks prior to sentencing in case number 2:15-cr-20025, Byrd made his first appearance before the Court in a second case.  (See 2:16-cr-20029 ECF No. 22.)  In that case, Byrd was indicted on one count of False Statements for making false statements regarding his criminal history on a form for prospective jurors in 2014.  (2:16-cr-20029 ECF No. 1.)  Defendant was convicted following a jury trial.  (2:16-cr-20029 ECF No. 39.)  On October 31, 2016, he was sentenced to 18 months' imprisonment with twelve months to run consecutively to, and six months to run concurrently with, the sentence imposed in case

---

[2] Before that, in 2003, Defendant had been convicted of Fraud by Wire in the U.S. District Court of North Dakota.  (Presentence Investigation Report, ECF No. 153 at PageID 496.)

number 15-20025, as well as three years of supervised release to run concurrently with the term of supervised release imposed in case number 15-20025.  (2:16-cr-20029 ECF No. 52 at PageID 143–44.)

Defendant was released from prison and began his term of Supervised Release on February 26, 2019.  (ECF No. 190.)  Defendant is asserted to have violated his Supervised Release conditions.  Prob 12A Orders from 2019 and 2020 set out how Defendant repeatedly failed to comply with the conditions of his Supervised Release that required him to "work regularly at a lawful occupation" and to pay restitution.  (ECF Nos. 190–192.)  Additionally, it appeared that Defendant failed to disclose material information regarding his federal convictions to the company with which he was reportedly doing business.  (ECF No. 191.) The Prob 12A Orders further assert that Defendant committed Bank Fraud; committed the offense of False Statements by knowingly submitting monthly supervision report forms containing materially false statements; and knowingly associated with a convicted felon without permission from his probation officer, leading the Court to issue a Summons on October 6, 2020.  (ECF Nos. 192, 194.)  On the Supervised Release Violation Worksheet, U.S. Probation recommended six-to-twelve months' imprisonment if Defendant were to be found guilty of the Supervised Release Violations.  (ECF No. 192 at PageID 2007.)  This range was based on the statutory maximum term of imprisonment in the cases to which Defendant's Supervised Release pertained.  (Id.)  On July 21, 2021, the parties appeared before the Court at a Supervised Release Violation hearing.  (ECF No. 226.)

B.   *The Court's Conduct and Statements at the Hearing*

i.       Conduct and Statements Relating to the Covid-19 Vaccination

At the start of the hearing, the Court asked who in the courtroom had not been vaccinated against COVID-19.  (Transcript, ECF No. 230, PageID 2368.)  When Government counsel expressed that he had not received the vaccine, the Court stated, "You need to get a vaccination.  We can't order you to get one, but it shows a lack of good judgment or caring about the people around you."  (Id. at PageID 2368–69.)  When Defendant expressed that he had elected not to receive the vaccine because of underlying health issues, the Court interrupted Defendant, stating, "What are they?  I have read your medical record.  You have asthma."  (Id. at PageID 2369.)  Defendant stated that he additionally has COPD.  (Id.)  The Court soon after stated that it was "appropriate" for Defendant, who had not been vaccinated against COVID-19, to "get a vaccination."   (Id. at PageID 2370.)   The Court continued, "You're going to be going to a facility where you're going to need to be vaccinated.  We don't want you to get sick in a federal prison.  So we need to get you vaccinated to protect you." (Id.)  The Court then further stated, "[B]ased on the recommendation, it looks like you may be going to a facility.  And we don't want you to be in a facility without being vaccinated.  So we all care about people staying healthy."   (Id.)   The Court told Defendant, "talk with your doctor, but really encourage the doctor unless there's some real good reason.  I hate to have a situation where you might be reporting to a facility, and you've not had that – you've not gotten your vaccination."  (Id. at PageID 2371.)

When questioned explicitly by Defense counsel if the Court had made a determination as to whether Defendant would be going to prison, the Court stated:

> No. But I want to take every step to get him vaccinated. So that if he does need to, we don't want that to be a last-minute situation.  I think it's safer for him, if he does go –

and we don't know for sure – than to have some time lapse between any report date and the last vaccination.

(Id. at PageID 2372.)  The Court soon after responded to Defense counsel's concern that the Court's decision regarding incarceration should be reserved for after the Defense presented its case:

> [W]e hadn't decided yet on that, and we may not have a situation where we need to be incarcerated.  But I am aware of the seriousness of the offense that's charged here, and I want to be – I want to treat everybody equally. . . . [W]e're going to let everybody make their own decision, but we wanted to be clear that we want to encourage everybody for safety purposes.

(Id. at PageID 2373.)  Defense counsel soon after made an oral motion for recusal, stating that the Court "ma[d]e some statements regarding that [Defendant]'s going to be going to a facility" before "consider[ing] the [Government's proof and the Section] 3553 factors."  (Id. at PageID 2376.)  The Court denied the oral motion.  (Id.)  Following this exchange, the Court repeatedly expressed that Defendant may or may not be going to prison, and that the Government was still required to prove its case, but that incarceration was a possibility based on the sentencing recommendation before the Court. (See, e.g., id. at PageID 2377, 2379–81.)  The Court reiterated that its primary concern was for the health and safety of Defendant and other similarly situated individuals.  (Id. at PageID 2377, 2391.)  "My main concern, on the health issue, is that I be clear that we want to get people protected.  And then after that, we're not – now, if the government can't prove these issues – these allegations, then he's not going to be going anywhere. He'll be staying at home."  (Id. at PageID 2377.)

> ii.    Conduct and Statements During Witness Examination and References to Defendant's History

Defendant alleges that, during the examination of witness Officer Taylor Smith, the Court's conduct included: "allow[ing] . . . the Government to testify for its own witness" on

direct examination; and, on cross examination, *sua sponte* making objections to the Defense's introduction of impeachment evidence, "conduct[ing] [the Court's] own colloquy of Officer Smith" that was outside the scope of the Government's direct examination and used to help the Government present favorable evidence, stating that admission of Defendant's exhibit was "up to the government. It's all hearsay," despite the Government's lack of objection, interrupting Defense's cross-examination and testifying for Officer Smith, and directing Defense counsel to "read the whole thing" as "the rule of completeness *may require when requested by opposing counsel.*"   (ECF No. 234 at PageID 2604–05.) (internal citations omitted.)

The Court also more than once "referenced [its] familiarity with Defendant" and his history before the Court.  (<u>Id.</u> at PageID 2605.)  Specifically, after explaining that it was trying to "tell people that if there's a possibility that they're going to go to prison, please get your vaccine," the Court stated, "Mr. Byrd and I have been seeing each other now for, my goodness, six years? . . .  and I don't want anything to happen to him." (Transcript, ECF No. 230 at PageID 2377.)  Next, the Court stated, "Well, on the issue of recusal . . . I'll be glad to have somebody else handle the case. But I have had a long, long acquaintance with Mr. Byrd." (<u>Id.</u> at PageID 2379.)  Finally, in clarifying that it had not yet determined whether Defendant would be going to prison, the Court stated, "I don't have a conclusion at this time. I just say I'm – Mr. Byrd and I have seen each other for a long time, and I hope he – we don't have a problem." (<u>Id.</u> at PageID 2389.)

Following the hearing, Defendant renewed his motion for recusal.  (ECF No. 234.)

## II.        LEGAL STANDARD

Twenty-eight U.S.C. § 144 and § 455 govern recusal.  Section 144 provides in relevant part, "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."  28 U.S.C. § 144.  Even where a litigant has not moved for recusal, a judge may be required to *sua sponte* recuse himself.  Section 455(a) provides, "Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Id. § 455(a).  Section 455(b) lists five situations in which a judge must also disqualify himself.  Id. § 455(b).  The sole situation applicable to this case is, "Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(b)(1).   "The 'objective appearance' principle of subsection (a) makes irrelevant the subjective limitation of (b)(1): The judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so."  Liteky v. U.S., 510 U.S. 540, 553 n.2 (1994).   "'A district court judge must recuse himself where a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'"  U.S. v. Adams, 722 F.3d 788, 837 (6th Cir. 2013) (citing United States v. Dandy, 998 F.2d 1344, 1349 (6th Cir. 1993)).  By contrast, "a judge 'need not recuse himself based on the subjective view of a party[,] no matter how strongly that view is held,'" if the objective standard is not met.  U.S. v. Tolbert, 459 F. App'x 541, 545 (6th Cir. 2012) (quoting United States v. Sammons, 918 F.2d 592, 599 (6th Cir. 1990)).

In <u>Liteky</u>, the Supreme Court established a two-prong approach to the recusal inquiry. 510 U.S. at 551, 555–56.  In order to satisfy the standard for recusal, statements made, or opinions expressed, during judicial proceedings must either (1) "rel[y] upon knowledge acquired outside such proceedings [and outside prior proceedings involving the same Defendant], []or" (2) "display[] deep-seated and unequivocal [favoritism or] antagonism that would render fair judgment impossible."  <u>Id.</u>  However, regarding the first prong, "[t]he fact that an opinion held by a judge derives from a source outside judicial proceedings is not a . . . *sufficient* condition for 'bias or prejudice' recusal, since *some* opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will *not* suffice."  <u>Id.</u>  at 554.

The existence of the second prong means that an "extrajudicial source" is also not the exclusive "basis[, i.e., a *necessary* condition,] for establishing disqualifying bias or prejudice," or "impartiality."  <u>Id.</u> at 551, 554, 555.  "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring [during the proceedings], it is so extreme as to display clear inability to render fair judgment."  <u>Id.</u> at 551.  This is a "very high standard."  <u>Brandt v. Curtis</u>, 138 F. App'x 734, 741, 743 (6th Cir. 2005) ("In [<u>Liteky</u>], the Court announced an exacting standard."); <u>see also</u> <u>Mason v. Burton</u>, 720 F. App'x 241, 245 (6th Cir. 2017) ("[T]his is not an easy standard to meet.").  "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do "[n]ot establish[] bias or partiality."  <u>Liteky</u>, 510 U.S. at 555–56.

If a judge's recusal is not required, it is also not permitted. "Although a judge is obliged to disqualify himself when there is a close question concerning his impartiality, he has an equally strong duty to sit where disqualification is not required." United States v. Angelus, 258 F. App'x 840, 842 (6th Cir. 2007).

## III.    ANALYSIS

Defendant asserts that the Court's bias or impartiality warranting recusal may be deduced from what the Court now groups into three main aspects of the Court's statements and conduct during the July 21 hearing: (1) the Court's statements regarding the COVID-19 vaccination and Defendant's health history; (2) the Court's statement regarding Defendant becoming sick in a federal prison; and (3) the Court's conduct during examination of witness Officer Taylor Smith and statements referencing the Court's familiarity with Defendant. (ECF No. 234 at PageID 2602–06.)

*A.   The Court's Statements Regarding the COVID-19 Vaccine and Defendant's Health History Do Not Reasonably Create an Appearance of Bias or Partiality*

Defendant first asserts that the Court "used Defendant's supervised release hearing to announce the Court's individual preference for mandatory vaccinations, a position . . . largely based on extrajudicial sources" and that the Court's responses to Defendant "indicated the Court was basing its opinion of the satisfactoriness of [Defendant's] responses on information the Court had learned from [extrajudicial] sources."   (ECF No. 234 at PageID 2603.) Defendant asserts that even in expressing concern for Defendant's health, the Court "demonstrated at the very least an 'appearance' of bias."   (Id.)

As noted above, an "extrajudicial source for a judge's opinion about a case or a party is neither necessary nor sufficient to require recusal . . . [but] is merely a thumb on the scale in favor of finding either an appearance of partiality under § 455(a) or bias or prejudice under §

9

455(b)(1)." <u>United States v. Houston</u>, No. 17-5169, 2018 U.S. App. LEXIS 11738, *4 (6th Cir. May 3, 2018) (quoting <u>Bell v. Johnson</u>, 404 F.3d 997, 1005 (6th Cir. 2005)). Although the "'extrajudicial source' factor" <u>is</u> "often determinative," <u>Liteky</u>, 510 U.S. at 555, "the presence of extrajudicial facts, without something more, does not suffice to show bias." <u>Tejero v. Portfolio Recovery Assocs., L.L.C.</u>, 955 F.3d 453 (5th Cir. 2020) (citing <u>Liteky</u>, 510 U.S. at 554)).

First, the Court's "preference" for vaccination is consistent with the Administrative Orders of the United States District Court for the Western District of Tennessee.  The Administrative Order that was in effect during Defendant's Supervised Release Violation hearing states, "According to the CDC, COVID-19 vaccines are safe and effective.  The Court strongly encourages all staff, litigants, and any member of the public visiting court facilities to get vaccinated."  (Admin. Order No. 2021-18, filed June 3, 2021.)  Throughout the Pandemic, the Court has consistently valued the health and safety of Court personnel and the counsel and parties before it and has adhered to evolving health and safety regulations.  Such regulations are inextricable from the proceedings themselves, and the Court doubts whether they may properly be considered extrajudicial; even so, the Court's adherence to the rules in no way indicates or suggests the Court's partiality toward one party or the other in this case.

Second, to the extent the Court's conclusion regarding Defendant's ability to safely receive the COVID-19 vaccine stems from extrajudicial sources, these sources were not inappropriate for the Court to consider.  Defendant takes issue with the Court's "conclu[sion] that Defendant's underlying health concerns did not provide sufficient basis for Defendant to forego vaccination" (ECF No. 234 at PageID 2603 n.1), but the Court's view aligned with CDC guidelines, of which it was certainly appropriate for the Court to take judicial notice.

The CDC has advised since before Defendant's hearing that "COVID-19 vaccines may be administered to most people with underlying medical conditions."  Centers for Disease Control and Prevention ("CDC"), COVID-19 Vaccines for People with Underlying Medical Conditions    (updated    Oct.    1,    2021),    https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/underlying-conditions.html.   The CDC does not caution individuals with asthma or COPD against receiving the vaccine.  Id.  Further, the Court tempered its initial conclusion that Defendant could safely receive the vaccine when the Court advised Defendant that he should talk with his doctor about the matter.  (see ECF No. 230 at PageID 2371.)

Defendant does not allege that the court's disposition as to COVID-19 vaccination meets the "extreme" prong of the Liteky test, and it would be illogical to find that it does.  In Liteky, the Court gave as an example of judicial statements meeting the latter prong a District Judge who allegedly remarked in a "World War I espionage case against German-American Defendants: 'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'"  Liteky, 510 U.S. 540 at 555.  The Court's statements regarding the vaccine and its conclusion that "Defendant's underlying health concerns did not provide sufficient basis to forego vaccination" (ECF No. 234 at PageID 2603 n.1) are more than distinguishable.

Finally, the requirement that there be partiality, bias, prejudice, or the appearance thereof, is at odds with the Court's admonishment of both parties in regard to the COVID-19 vaccine in this case. As the Government states in its Response, "[f]rom the outset of the hearing the Court expressed displeasure and frustration with both government counsel and the defendant for not having received vaccinations to protect against Covid."  (ECF No. 235 at

PageID 2614.)  Specifically, as noted above, the Court said to Government counsel after he disclosed that he was unvaccinated, "You need to get a vaccination.  We can't order you to get one, but it shows a lack of good judgment or caring about the people around you." (Transcript, ECF No. 230 at PageID 2368–69.)   The Court's response to Government counsel's vaccination status undermines Defendant's claim that the Court could have reasonably appeared biased against Defendant and supports the contention that the Court was merely worried about health.  As explained below, the Court does not find that the Court's subsequent statements negated this lack of apparent bias.  Considered under both prongs of Liteky and the plain language of the recusal statutes, the Court's statements regarding its opinion of the COVID-19 vaccine and Defendant's ability to receive the vaccine could not be reasonably understood to constitute personal bias, prejudice, or partiality as required under the statutes.

*B. The Court's Statements Regarding the Need for Defendant to Be Vaccinated in a Federal Prison Do Not Reasonably Create an Appearance of Bias or Partiality*

Defendant next takes issue with the Court's alleged premature disposition of Defendant's case.  Specifically, Defendant claims that by stating to Defendant, "'You're going to be going to a facility where you're going to need to be vaccinated. We don't want you to get sick in a federal prison,'" the Court exhibited potential actual bias, or the appearance of bias, stemming from its "improper predisposition of Defendant's fate."  (ECF No. 234 at PageID 2604.) (citation omitted.)  Defendant alleges that the Court's subsequent apology for its remarks failed to "undue [*sic*] or avoid" the impropriety of its statement that Defendant would be going to federal prison (id.) and that the "Court . . . effectively removed the burden of proof from the Government and placed it on the Defendant to convince the Court [that Defendant was not going to be going to a federal facility]."  (Reply, ECF No. 237

at PageID 2631.)  In its Response, the Government concedes that "[t]his remark, viewed in isolation, arguably suggests that the Court had prejudiced the outcome of the proceedings." (ECF No. 235 at PageID 2617.)  "However," the Government asserts, "it is clear from the Court's subsequent remarks [that] the Court was merely expressing concerns for the defendant's health situation," both for Defendant's own protection and the protection of other "unvaccinated individuals."  (Id. at PageID 2617–18.)  The Court agrees with the Government.  Through its subsequent comments, the Court effectively (and repeatedly) clarified that the Government bore the burden of proof and that the Court had not yet made its determination as to Defendant's fate.  (Transcript, ECF No. 230 at PageID 2370–73, 2376–77, 2379–81.)

Additionally, the Court finds that the recusal standard is not met when considering the Court's statements under the Liteky prongs.  Defendant does not allege that the Court's statement relied on an "extrajudicial" source.  (see ECF No. 234 at PageID 2604; ECF No. 2630–31.)  However, to the extent the Court's statements were based on the sentencing guidelines—which recommend that Defendant be sentenced to six-to-twelve months' imprisonment (ECF No. 192 at PageID 2007)—they do not stem from an "extrajudicial" source but rather from the record in the current proceedings.  See Liteky, 510 U.S. at 551, 555.  The Court's statements, taken in context, also fail to meet the "extreme" prong of the Liteky test.  The Court's statements simply do not reveal "deep-seated and unequivocal antagonism that would render fair judgment impossible."  Liteky, 510 U.S. at 556.  In the Sixth Circuit case Brandt v. Curtis, for example, the trial judge had stated to the jury:

> You're looking at [the defendant] and he is charged with penetrating-I don't know whether he-what he penetrated her with, it isn't necessarily his penis, but it might be his penis, I don't know. But I'll leave that to the proofs, I'll leave that to the

> prosecution, because the law doesn't require that penetration be about a penis. It simply means that the person was penetrated for sexual purposes or gratification.

Brandt v. Curtis, 138 F. App'x 734, 742 (6th Cir. 2005) (citation omitted).  The Sixth Circuit concluded that the judge's pre-trial statements were "clearly not prejudicial" under Liteky's "exacting standard."  Id. at 741–42.  The court stated that although the above comment was "troubling because it implied that the defendant did, in fact, penetrate the victim with something[,] . . . the surrounding statements demonstrate that the judge was speaking hypothetically and that he expected the jury to presume innocence until proven guilty by the prosecution."  Id.  Likewise, as discussed above, the Court's subsequent comments regarding the hypothetical nature of its statement and the Government's burden of proof adequately dispelled any appearance of prejudice that would prevent fair judgment in the case.

Overall, the Court is not convinced that a "reasonable person *with knowledge of all the facts* would conclude that the judge's impartiality might reasonably be questioned."  Adams, 722 F.3d at 837 (citing Dandy, 998 F.2d at 1349) (emphasis added).  See also Brandt, 138 F. App'x at 742 ("Taken in isolation, several [of the judge's pre-trial] statements [to the jury] do appear problematic, but when read in context it is clear that no serious errors were made.")

*C. Defendant's Claim of Impartiality Due to Court Commentary/Assistance During Government's Case is Not Supported by the Record*

Finally, Defendant argues that the "Court improperly and substantially intervened in Defendant's hearing" by assisting the Government in its case, and that the totality of the circumstances would "lead a reasonable person to question the impartiality of this Court and at a very minimum create a strong appearance of impartiality."  (ECF No. 234 at PageID 2606–07.)  Defendant cites to several examples of the Court's statements and conduct during Officer Smith's testimony, described in Section I.B.ii., *supra*.  (Id. at PageID 2604–05.)

14

(citations omitted.)  Defendant "does not contend that this Court was necessarily biased in its evidentiary rulings" but does claim "that this Court substantially assisted the Government in presenting its proof, especially that of the Government's key witness, Officer Smith."  (Id. at PageID 2607.)   The Government responds that, per Liteky, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  (ECF No. 235 at PageID 2618.) (quoting Liteky, 510 U.S. at 555.)   Defendant replies, however, that he is alleging that the "Court's conduct during the hearing, rather than the Court's findings, support a showing of [a] 'high degree of antagonism as to make fair judgment impossible.'"  (ECF No. 237 at PageID 2631.) (quoting Liteky, 510 U.S. at 555.)

"The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a).  A federal trial judge has a "duty to see that the issues are not obscured and that the testimony is not misunderstood. He has the right to interrogate witnesses for this purpose."  U.S. v. Hickman, 592 F.2d 931, 933 (6th Cir. 1979) (citations omitted).  "[I]t is well established that a trial court judge 'may interject himself into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence or aid in its orderly presentation.'"  Mason v. Burton, 720 F. App'x 241, 248 (6th Cir. 2017) (citing United States v. Powers, 500 F.3d 500, 511–12 (6th Cir. 2007)).  However, the judge's "right to participate in the proceedings and to interrogate witnesses is not [] unlimited"; instead, "[t]he judge should exercise self-restraint and preserve an atmosphere of impartiality."  Knapp v. Kinsey, 232 F.2d 458, 466 (6th Cir. 1956) (citations omitted). "[I]nterference with the presentations of counsel has the potential of making a mockery of a

defendant's right to a fair trial, even in the absence of open hostility."  Hickman, 592 F.2d at 934 (citations omitted).

"Recusal [has been] warranted . . . [in] instances in which the trial judge consistently interrupted the proceedings in a one-sided manner."  U.S. v. Ransom, 428 F. App'x 587, 589 (6th Cir. 2011) (citing Lyell v. Renico, 470 F.3d 1177, 1187 (6th Cir. 2006); Nationwide Mut. Fire Ins. Co. v. Ford Motor Co., 174 F.3d 801, 805–08 (6th Cir. 1999), overruled on other grounds by Adkins v. Wolever, 554 F.3d 650 (6th Cir. 1999) (en banc); United States v. Hickman, 592 F.2d 931, 936 (6th Cir. 1979)).  Defendant cites this statement from Ransom and includes the internal citation to Lyell, Nationwide, and Hickman, yet he does not explore in any detail the authorities cited.  (See ECF No. 234 at PageID 2606.)

In Lyell, applying Liteky's second prong, the court remarked, "Difficult as this standard is to reach, the trial court seemingly made every effort to satisfy it."  470 F.3d at 1187.  The Court summarized the trial judge's behavior:

> [T]he trial judge took over the cross-examination of the central witness in the case (Nimeth) and elicited information not revealed on direct examination. The trial judge rarely waited for the prosecution to object before limiting questioning; she instead chose to limit questioning on her own throughout the trial. The concentration of interruptions during Nimeth's cross-examination, the derogatory tone and content of many of the interruptions (throughout the trial) and the implicit disapproval of defense counsel's theory of the case through these interruptions all put Lyell at a unique disadvantage in trying to encourage the jury to see the case through his eyes.

> Making matters worse, the trial judge's interruptions ran in one direction. While the trial judge frequently interrupted Lyell's presentation of his case in an unhelpful way, she rarely interrupted the prosecution's presentation of the case, save when doing so helped the government. At one point the judge urged the prosecutor to ask a question even after the prosecutor explained that it would elicit inadmissible hearsay, and at another point she sought an answer to a question that the prosecutor had voluntarily withdrawn.

> Altogether, then, we have a case in which the judge *sua sponte* interrupted the prosecution to assist it, *sua sponte* interrupted Hart's questioning in a way that undermined his presentation of the case (frequently during the cross-examination of the central witness in the case), failed to interrupt in a like manner during the

16

prosecution's questioning (at least in a way that *undermined* its case), stated or implied her disapproval of Lyell's theory of the case (evidenced by her statements to the effect that Nimeth's proclivity for lying to police was not an issue in the case or that she "didn't get" the point of Hart's motive-questioning) and made clear her disapproval of Lyell's defense counsel (calling him an actor, a child, silly and a smart aleck). Capping all of this off was the trial judge's inexplicable decision to issue a contempt order against Lyell's counsel in front of the jury.

Id. (internal citations omitted).  The court concluded, "On this record, the trial judge's actions-considered in the context of the entire trial-made a fair trial impossible."  Id.

In Hickman, a pre-Liteky case, the Sixth Circuit found impartiality by the district court that warranted overturning the defendants' convictions. 592 F.2d at 934, 936.  In that case, the court "interjected itself more than 250 times in a one-day trial, took it upon itself to rehabilitate witness testimony after defense counsel had conducted cross-examination, and did not wait for objections, but 'would *sua sponte* interrupt a witness or counsel, with the words "objection sustained" and then proceed to state why the witness' testimony was in some way objectionable.'"  U.S. v. Lossia, 193 F. App'x 432, 437 (6th Cir. 2006) (quoting and summarizing Hickman, 592 F.2d at 932–35).  The court "largely took over examination of [a] witness for . . . six pages of transcript" and then "took over cross-examination entirely by himself for more than ten additional pages."  Hickman, 592 F.2d at 936.  "Further, the district court in *Hickman* cut off defense counsel in closing argument and, in the jury's presence, admonished that 'I won't let you tell them rotten law.'"  Lossia, 193 F. App'x at 437 (quoting Hickman, 592 F.2d at 936).  In Nationwide, the court considered whether the plaintiffs were denied a fair trial, ultimately finding in the affirmative but concluding, "[W]e do not think it appropriate that we burden another judge's docket because of error caused by [the district judge]. Consequently, we have chosen to leave to [the district judge's] discretion whether he conducts the retrial or recuses himself." 174 F.3d at 808–09.  The court did not mention Liteky but instead applied "factors" for impartiality articulated in Hickman.  Id. at 805, 808.

17

District courts in this Circuit have noted that "[t]he Sixth Circuit has adopted the _Liteky_ standard in judicial disqualification cases."  See, e.g., U.S. v. Higdon, No. 3:14-CR-85, 2014 WL 6982434, at *2 (E.D. Tenn. Dec. 10, 2014) (citing Lyell, 470 F.3d at 1186–87); Lattanzio v. Brunacini, No. 5:16-171-DCR, 2018 WL 1865164, at *2 (E.D. Ky. Apr. 18, 2018) (citing Lyell, 470 F.3d at 1186–87). See also U.S. v. Ransom, 428 F. App'x 587 (6th Cir. 2011) ("The leading case from the Supreme Court on recusal under § 455 is _Liteky_.") The Court finds that while Hickman and cases following it help guide an analysis as to what may constitute impermissible impartiality on the part of the court, the standard in Liteky, and specifically Liteky's second prong, are directly controlling on the issue of recusal based on allegedly inappropriate judicial conduct.  Thus, the Court will assess the Court's conduct during Defendant's hearing under that "very high standard."  Brandt, 138 F. App'x at 743.

Defendant asserts that "the Court inappropriately participated in the direct and cross-examination of Officer [] Smith . . . during Defendant's hearing and in favor of the Government" in several ways that the Court now addresses in turn.  (ECF No. 234 at PageID 2604–05.)

i.      Allowing the Government to Testify for Its Own Witness

Defendant first claims that the Court "allowed (by leading and/or otherwise) the Government to testify for . . . Officer Smith" on "more than one occasion" during direct examination.  (ECF No. 234 at PageID 2604.) (citing Transcript, ECF No. 230 at PageID 2426 ¶¶ 3–6; PageID 2426–27 ¶¶ 18–25, 1–7; PageID 2428 ¶¶ 1-4; PageID 2430 ¶¶ 18–19.) Examination of these portions of the Transcript and their surrounding context shows that, in the first instance, the Court asked Government counsel to explain an exhibit and to clarify that it was an image of text messages; the Court then asked if the exhibit included the date the

messages were sent.  (ECF No. 230 at PageID 2426–27.)  Defense counsel then objected to lack of foundation for knowledge as to handwriting as well as to leading questions.  (Id. at PageID 2427.)  The Court responded, "Let's see if we can proceed without the leading. I understand that this is different, and you probably can lead. But it will be a little better to hear it from the officer."  (Id. at PageID 2428.)  The Court stated soon after that Defense counsel made a "good point" as to the relevance of the text messages, as it was unclear "from [the] document, at least through this witness" when they were sent.  (Id.)  (The date and content of these messages were relevant to the issue of whether Defendant knowingly associated with a felon while on supervised release, in violation of the conditions of supervised release.)  (See id. at PageID 2425.)  The Court then inquired where Defendant was on February 19, 2019, the date the text messages were allegedly sent, as he was not yet under supervision.  (Id. at PageID 2430.)  Government counsel responded, "Perhaps the halfway house?"  (Id.)  The Government's witness, Officer Smith, said, "Or the halfway house, Your Honor, uh-huh." (Id.)  The Court asked, "Is there a way to check that[?]" (Id.)

The Court finds that, overall, this exchange is less consistent with impermissible impartiality as it is with a judge's right to "'interject himself into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence or aid in its orderly presentation.'"  Mason, 720 F. App'x at 248 (citing Powers, 500 at 511–12).  Further, several pages of transcript later, Defense counsel moved to strike testimony that was "outside the scope of the [probation] petition [for a summons]" based on the timeline discussed above, or to amend the petition accordingly, while the Government moved to strike particular language in the petition.  (Transcript, ECF No. 230 at PageID 2449–52.)  The Court entertained oral argument from both counsel before allowing them time to research and

submit briefs on the issues.  (Id. at PageID 2450–53, 2455–58.)  The Court's even-handed handling of the matter, and the opportunity it afforded counsel to further develop their positions, effectively neutralized any improprieties or perceived partiality in its conduct above.

ii.     _Sua Sponte_ Objecting to Introduction of Impeachment Testimony on Cross-
        Examination

Defendant next asserts that the Court _sua sponte_ made an objection to "Defense Counsel's attempted introduction of impeachment evidence" during cross-examination of Smith.  (ECF No. 234 at PageID 2604.) (citing Transcript ECF No. 230 at PageID 2526.)  Indeed, the Court objected to introduction of a document prepared by the Defense "for impeachment purposes" because it did not match up with a document prepared by the Witness.  (Transcript, ECF No. 230 at PageID 2526.)  The Court stated, "You can't use it for cross-exam if it's not accurate" and added that the Court needed "to make credibility determinations." (Id.)  However, the Court soon clarified with Defense counsel that the Defendant had prepared the document using alternative calculations (to compute Defendant's income for the purpose of restitution) and that the Court had misunderstood the nature of the impeachment evidence and Defense counsel's intent; the Court then allowed Defense counsel to continue using the document.  (Id. at PageID 2527–29.)

This exchange seems, on first blush, similar to the judge's _sua sponte_ objections in Hickman, but the Court's attempt to understand Defense counsel's position and its retraction of its initial objection are distguishable.  Also readily distinguishable is a bristly exchange in Lyell involving an uncured misunderstanding between the court and counsel. 470 F.3d at 1180.  There, the judge interrupted counsel fourteen times in an hour to state that his line of questioning was irrelevant, and when he "persisted in this line of questioning," the judge

"interjected: 'What does that have to do with this? I don't understand the point you're making.'" When counsel "explained that he intended to use the questions to discredit the prosecution's theory of motive, . . . the judge responded, 'I guess I just don't get it,'" apparently without affording counsel any opportunity for further explanation. Id. (internal citations omitted).

Furthermore, on review of the Transcript, the Court notes that five pages later, after continued discussion of the documents described above, the Court noted that the guideline on income computation should be entered, "so there's not a debate about what's properly included" in the computation. (ECF No. 230 at PageID 2531.) When Defense counsel stated that "the government has the burden on this issue," the Court clarified, "They do, but my thought is you may well be right," adding, "And we wouldn't want to withhold it from you if you're right about it." (Id.) The Court finds that this statement dispelled any appearance of impartiality against Defendant throughout this episode.

    iii.    Questioning Officer Smith on Cross-Examination

Next, in an exchange that Defendant describes as the Court's "own colloquy of Officer Smith" (ECF No. 234 at PageID 2604) (citing Transcript, ECF No. 230 at PageID 2545 ¶ 20 through PageID 2547), the Court interrupted during cross-examination to ask Officer Smith who was the contact at the company with which Defendant allegedly worked and if she "had any bona fides on [the company]." (Transcript, ECF No. 230 at PageID 2545–46.) The Court stated that it was "not doubting it" and "not saying [the company was] not real" but was "just curious if we had anything else" about them besides their website and Defendant's statements about them. (Id. at PageID 2546–47.)

Defendant first asserts that the Court's "line of questioning was outside the scope of the Government's initial direct examination." (ECF No. 234 at PageID 2604.) In Lyell, one

aspect of the trial judge's misconduct was that she "took over the cross-examination of the central witness . . . and elicited information not revealed on direct examination." 470 F.3d at 1187.  The Court finds that while the issue of Byrd's employment during the period of supervision was raised on direct examination (Transcript, ECF No. 230 at PageID 2417–21), the Court did elicit new information in this instance.  However, the Court does not find that this alone revealed the degree of impartiality that would warrant recusal.

Defendant additionally asserts that the Court's questioning was used to "assist the Government in presenting evidence favorable to the Government."  (ECF No. 234 at PageID 2604.)  The Court finds, however, that the Court's inquiry was reasonably neutral and could have produced information favorable to Defendant, depending on Officer Smith's responses.  Additionally, unlike the court's sixteen-page colloquy in Hickman, 592 F.22d at 936, or its "extensive[]" witness questioning in Nationwide, 174 F.3d at 805–08, the Court's questioning of Officer Smith occurred over little more than a single transcript page. (See ECF No. 230 at PageID 2545–46.)  More importantly, the tenor of the Court's inquiries hardly amounted to the court's "derogatory tone and content" and "implicit disapproval of defense counsel's theory of the case" in Lyell, 470 F.3d at 1187, nor to the court's "negative and harsh tone" and "particular[] protect[ion]" of the Government's witness in Brandt, 138 F. App'x at 742.  In Brandt, although the Court ultimately affirmed denial of habeas relief based on AEDPA's deferential standard of review and the strict standard of Liteky, it noted that the "judge's frequent interruptions of defense counsel during his questioning of witnesses . . . [were] [] troubling."  138 F. App'x at 742.  More "important than the number of interruptions" (at least eight times), "was the negative and harsh tone used by the judge during these interruptions." Id.  The trial judge "was particularly protective of the victim's mother . . . during defense

counsel's cross-examination, which was significant given the defense's theory that [she] was the real perpetrator." Id.

Overall, the dissimilarities from cases warranting recusal or finding impermissible impartiality on the part of the trial judge convince the Court that the Court did not abuse its role in this instance.

    iv.    Soliciting Objection by the Government on Cross-Examination

Defendant next points to an incident in which the Court stated, "It's up to the government. It's all hearsay" in response to Defense counsel's request to enter an exhibit, although the Government had not previously attempted to object.  (ECF No. 234 at PageID 2605) (citing Transcript, ECF 230 at PageID 2553.)  "[S]oliciting objections from a party was one factor [in Hickman] that led to a remand for judicial misconduct."  Nationwide, 174 F.3d at 808 (citing Hickman, 592 F.2d at 934, 936).  Unlike in Nationwide, however, Defendant does not claim that the Court made "frequent suggestions" to Government counsel "that he ought to register objections."  Nor did the Court go so far as to "urge[] the prosecutor to ask a question even after the prosecutor explained that it would elicit inadmissible hearsay."  Lyell, 470 F.3d at 1187.  Moreover, the Court did not solicit objections from counsel in a one-sided manner; almost immediately after this statement, the Court asked Defense counsel if he had any objection to a proposed exhibit from the Government.  (Transcript, ECF No. 230 at PageID 2553.)  Finally, the Court's suggestion that the evidence was hearsay carried significantly less weight than it would in a trial, since in supervised release hearings, the Federal Rules of Evidence do not apply.  United States v. Lofton, 810 F. App'x 436, 438 (6th Cir. 2020) (citing Fed. R. Evid. 1101(d)(3)).  As such, "district courts may 'consider[] reliable hearsay evidence.'"  Id. (quoting U.S. v. Waters, 158 F.3d 933, 940 (6th Cir. 1998)).

v.  Interrupting Defense Counsel's Cross-Examination and Testifying for Officer
Smith

Next, Defendant contends that "the Court interrupted Defense Counsel's cross-examination and ultimately testified for Officer Smith" while Defense counsel was "attempting to present impeachment evidence of Officer Smith's former testimony." (ECF No. 234 at PageID 2605.) (citing Transcript, ECF 230 at PageID 2561–63.) The Transcript reveals that the Court stopped Defense counsel's attempted impeachment of Officer Smith on the issue of when Defendant's restitution payment had been received because "an official record [with the Clerk's Office] [] shows when it's received." (ECF No. 230 at PageID 2561–62.) Upon Defense counsel's statement that he was trying to impeach the witness, the Court stated, "I thought you were just trying to get a fact" and added soon after, "I was just suggesting that the best way to have the best data here [was to get the record from the Clerk's Office]. And if it's incorrect, Ms. Smith will have been shown to be incorrect on it." (Id. at PageID 2562–63.) The Court then told Defense counsel, "You can go ahead and ask the question. I was just trying to be a little more efficient." (Id. at PageID 2563.) The Court also stated that Defense counsel had a good point that Officer Smith "had to be able to testify about it." (Id.)

On review of the Transcript, the Court finds that these statements were within the bounds of its role of promoting efficiency of the proceedings. See Fed. R. Evid. 611(a). Moreover, as in Defendant's second example, *supra*, and once again unlike in Lyell, 470 F.3d at 1180, the Court clarified its misunderstanding of Defense counsel's intention rather than belittling Defense counsel, ultimately permitting Defense counsel to cross-examine the witness. The Court's interruption in also distinguishable from the Brandt court's "negative and harsh tone" and "particular[] protection of the victim's mother" in contrast to the

defense's theory of the case.  <u>Brandt</u>, 138 F. App'x 734.  Here, by contrast, the Court's interruptions did not contain value judgments as to the merit of Defense counsel's questioning.  Thus, overall, this instance did not demonstrate impermissible impartiality.

vi.   <u>Directing Defense Counsel to Follow the Rule of Completeness during Cross-Examination</u>

Finally, Defense counsel claims that the Court "directed Defense Counsel to 'read the whole thing,' as the rule of completeness *may require when requested by opposing* counsel." (ECF No. 234 at PageID 2605.) (citing Transcript, ECF No. 230 at PageID 2575 ¶ 4–17.)  The Court did invoke the rule of completeness, but the Transcript suggests that the Court was merely trying to move the proceedings along; the Court had immediately prior stated to Defense counsel regarding the section of the Probation Manual about which Defense counsel was asking the witness, "Well, why don't you just read the whole thing, so we keep it all together?"  (<u>Id.</u>)  The Court finds that the Court was within the bounds of its function to promote the efficiency of the proceedings, "avoid wasting time," and "aid in [the] orderly presentation" of evidence.  Fed. R. Evid. 611(a); <u>Mason</u>, 720 F. App'x at 248 (citing <u>Powers</u>, 500 F.3d at 511–12).  The Court reiterates that the Rules of Evidence were inapplicable to this hearing.  <u>See</u> <u>Lofton</u>, 810 F. App'x at 438 (citing Fed. R. Evid. 1101(d)(3)).

In addition to the instances of allegedly improper judicial intervention discussed above, Defendant claims that the Court's "several" references to its "familiarity with Defendant . . ., under the totality of this Court's conduct and statements, support the notion that this Court improperly assisted the Government throughout Defendant's hearing," creating "at a very minimum [] a strong appearance of partiality."  (<u>Id.</u> at PageID 2605–06.) (citing Transcript, ECF No. 230 at PageID 2377 ¶¶ 8–10; PageID 2379 ¶¶ 11–13; PageID 2389 ¶¶ 9–12.)  Defendant acknowledges that the Court's statements alluding to Defendant's history with

25

the Court, detailed *supra* in Section I.B.ii., would "alone [] not ordinarily be grounds for recusal."  (Id. at PageID 2605.)   The Court has determined, as discussed above, that the Court's other conduct and statements did not constitute improper assistance to the Government nor create "a strong appearance of partiality."   The Court's permissible references to, and opinions derived from, past proceedings involving Defendant (see Liteky, 510 U.S. at 551, 555) do not reasonably combine with other innocent statements to create an appearance of bias.

Having considered the Court's allegedly offending conduct both as a whole and in light of the entire record, the Court finds that the Court's conduct did not rise to the high standard articulated in Liteky; the Court's behavior and statements did not demonstrate such impartiality or bias, or the reasonable appearance thereof, as "would render fair judgment impossible." Liteky, 510 U.S. at 556.

## IV.   CONCLUSION

As stated above, "although a judge is obliged to disqualify himself when there is a close question concerning his impartiality, he has an equally strong duty to sit where disqualification is not required." Angelus, 258 F. App'x at 842.  Thus, although Defendant is correct that the Court "indicated its willingness to recuse itself from this matter" during the hearing (ECF No. 234 at PageID 2607), what governs is not the Court's statement but whether recusal is mandated, and thus permitted, by the statutes at issue.  The Court finds that it is not.

For each of the reasons set forth above, Defendant's Renewed Motion for Recusal is **DENIED**.

**SO ORDERED**, this 10th day of November, 2021.

 /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE